**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 06 CR 440** |
| | ) | |
| **DARNELL THOMPSON** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

A jury convicted Darnell Thompson of possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). Thompson, now represented by new counsel, has moved for entry of a judgment of acquittal, to arrest judgment, or for a new trial. For the reasons stated below, the Court denies Thompson's motions for a judgment of acquittal and to arrest judgment but grants his motion for a new trial.

**Background**

On January 21, 2006, a Chicago police officer arrested Thompson at a 7-Eleven store on the north side of Chicago after the officer claimed to see Thompson exceeding the speed limit and driving erratically. Officers searched the Isuzu sport utility vehicle that Thompson had been driving and found a handgun on the floor beneath or behind the driver's seat. A grand jury indicted Thompson, who had a prior felony conviction, for violating section 922(g)(1).

**1.     Hearing on defendant's motion to suppress evidence**

Thompson was initially represented by appointed counsel, who filed a motion to

suppress the firearm on the ground that the police had obtained it as the result of an unlawful search of the Isuzu. Thompson thereafter retained a new attorney. On February 4, 2008, the Court conducted an evidentiary hearing on the motion to suppress.

At the hearing, Chicago police officer Timothy Walter testified that on the night of January 20-21, 2006, he was assigned to traffic enforcement duty in the 19th police district and was working the 10:00 p.m. to 6:30 a.m. shift. Around 4:00 a.m., he was on DUI (driving under the influence) enforcement patrol, driving a marked squad car north on Kedzie Avenue approaching Irving Park Road, when he saw Thompson's Isuzu driving south on Kedzie Avenue in excess of the thirty mile-per-hour speed limit and driving to the left of the center line. Walter turned and followed the Isuzu; he was traveling forty-five miles per hour. In the 3900 block of North Kedzie Avenue, the Isuzu drove completely into the oncoming lane of traffic and then drove through a stop sign at Byron Street at the same rate of speed. Walter activated the lights and siren on his car, and the Isuzu came to a stop in the parking lot of a 7-Eleven store on the northwest corner of Kedzie Avenue and Grace Street. About thirty to forty-five seconds had passed since Walter had first seen the Isuzu.

Walter got out of his squad car and approached the driver's side of the Isuzu. At this point, Walter said, he called Chicago police officers John Maclaren and Chris Fraterrigo, knowing Maclaren to be certified to conduct breathalyzer tests.

As he approached the Isuzu, Walter observed Thompson sitting in the driver's seat with the window open. Walter asked Thompson for his driver's license, vehicle registration, and proof of insurance; Thompson picked up some papers, fumbled them,

and dropped some, and then told Walter that he was "driving on a ticket" and did not have his license and that his insurance card was at his home. Walter testified that he smelled a strong odor of alcohol coming from Thompson's breath and that Thompson had bloodshot, glazed, and glassy eyes, spoke with slurred and mumbled speech, and appeared disoriented.

Walter asked Thompson to get out of the car, and Thompson complied. Walter observed that Thompson appeared unsteady. Walter guided Thompson into the store to conduct field sobriety tests on a flat and dry surface, as the parking lot was slushy from snow that was still falling. Walter described his training to conduct field sobriety tests and stated that he administered several such tests, all of which Thompson failed. Walter stated that he then placed Thompson under arrest for driving under the influence of alcohol and the other traffic offenses he had observed, advised Thompson of his rights, and placed him in handcuffs. Walter then walked outside the store with Thompson and put him in the rear seat of the squad car.

Walter stated that while he was sitting in his squad car after arresting Thompson, he saw officer Maclaren walk up to Thompson's Isuzu and open the driver's door. Shortly thereafter, Maclaren signaled Warren to come over to the Isuzu. Walter directed Fraterrigo to stand at the squad car where Thompson was seated and then approached the passenger side of the Isuzu and looked in through the back door, which he opened or was already open. Maclaren shone his flashlight through the driver's front window onto the rear floor of the Isuzu and pointed; Walter observed the handle of a pistol that he could see protruding from under the rear of the driver's seat. Walter instructed Maclaren to seize the gun, which Walter identified in court.

3

Walter testified on cross examination that he had transported Thompson to the 19th district police station but stated on redirect that he followed the vehicle in which Thompson was transported. At the station, Walter performed a custodial search of Thompson. Walter signed off on papers allowing the Isuzu to be towed and impounded, and he believed the car was then towed and impounded as a result. He identified a report stating that the Isuzu had been towed from the police station. Walter stated that to retrieve a vehicle that has been towed by the Chicago Police Department in connection with a DUI arrest, the owner must request an administrative hearing and pay a fine and a fee and cannot obtain the vehicle the same day it is towed. Walter said he understood that Maclaren had driven the Isuzu to the police station, as Maclaren gave the keys to Walter there. When asked directly, however, Walter said he had not seen what happened to the Isuzu. Walter denied returning the car keys to Thompson's wife that morning.

Officer John Maclaren testified that at 4:00 a.m. on January 21, 2006, Walter called him to the 7-Eleven store at Grace and Kedzie, and Maclaren drove there with his partner, Chris Fraterrigo. He observed Walter's car and the Isuzu in the store's parking lot. Maclaren entered the store, where he saw Walter conducting a field sobriety test on Thompson. After Walter finished, Maclaren said, "[w]e escorted Officer Walter with the subject back to Officer Walter's car . . . ." Feb. 4, 2008 Tr. 39. Walter patted Thompson down, handcuffed him, and put him into the rear of the squad car. Once Thompson was handcuffed, Maclaren went to Thompson's car and searched it. Maclaren stated that using his flashlight, he observed a pistol on the floorboard behind the driver's seat. He first saw the gun while looking in through the rear passenger door.

In contrast to Walter, Maclaren said he could see the entire gun on the floor behind the seat; it was not under the seat. He motioned to Walter to come to the car and then showed Walter the pistol, pointing to it with his flashlight. Maclaren stated, in contrast to Walter, that when he showed Walter the pistol, he (Maclaren) was still standing near the rear passenger door; he did not recall where Walter was standing. Maclaren then retrieved the pistol and unloaded it. At 5:27 a.m., at the police station, he administered a breathalyzer test to Thompson, which showed a blood alcohol concentration of .166.

Thompson testified at the hearing that after he was pulled over by Walter into the 7-Eleven parking lot, Walter asked for his driver's license and insurance. He replied that he did not have his license because he was driving on a ticket. Walter took the ticket and returned to his squad car. He later came back and asked Thompson to turn off the car and give him the keys; Thompson complied. Walter asked Thompson to step out of the car so that Walter could conduct a field sobriety test. Walter directed him to go inside the store for the test because it was snowing and the parking lot was slushy.

Thompson said that after conducting the sobriety test, Walter handcuffed him while they were still inside the store and walked him to the squad car. Thompson said he had not seen any of the other officers enter the store. As they were exiting the store, Thompson saw two officers at his car. Thompson could tell they had already conducted a search, because the Isuzu's driver's side doors were open, and one of the officers, who was standing on the driver's side of the car, was saying "look what we have here" and was holding what appeared to be a firearm. The other officer was on the passenger side of the Isuzu. Thompson was placed into Walter's squad car, and

Walter then returned to the Isuzu and spoke with the other officer.  He observed officers continuing to look into his car with flashlights.  He was taken to the police station; his Isuzu remained in the parking lot.

At the police station, Thompson tried unsuccessfully to contact his wife and then contacted a friend and asked the friend to call his wife to let her know he was at the Belmont and Western police station.  He remained in jail for a little over two days – from early Saturday morning, when he was arrested, until Monday evening.  His wife picked him up at the jail in the Isuzu.  Thompson stated that he never received any notice indicating the car had been impounded and that to his knowledge, his wife did not have to go to an auto pound to retrieve the car.

On cross examination, Thompson denied he was driving forty-five miles per hour.  He admitted he had been drinking earlier in the evening.  He also admitted that he had been convicted of several felonies.

Mrs. Thompson also testified at the hearing.  She stated that on the morning of January 21, she received a call from one of Thompson's friends who said Thompson had been arrested, and then she received a call from Thompson.  A relative drove her to the Belmont and Western police station.  She went to the desk and inquired about her husband; an officer came out and told her what Thompson was being charged with. The officer gave her the car keys and told her the car was at the 7-Eleven at Kedzie and Grace.  She never got a notice of impoundment or of an administrative hearing, and she did not have to pay any fees or fines or fill out any forms.  She believed the officer who gave her the keys was named Walter but identified the officer as having gray hair – which Walter did not appear to the Court to have.

The government argued that the search of Thompson's car was justified as a proper search incident to arrest or as a probable cause-based search of an automobile. The defense argued that there was no probable cause to search the Isuzu because there was no indication that the vehicle might contain evidence of the DUI offense for which Thompson was arrested (or, for that matter, the other traffic charges) and that the search was not incident to arrest because it took place before the arrest. In that regard, the Court noted the possibility of an inevitable-discovery claim if the search happened too soon to be considered incident to Thompson's arrest. Defense counsel responded that there was no evidence that the car inevitably would have been searched following an arrest of this type and that the inevitable discovery doctrine could not be used to make good an improper search. Counsel also argued that there was no evidence that the car was impounded, which if true might have provided a proper basis for a search. In rebuttal, the government argued that a search incident to arrest was, in fact, inevitable. The government stated that it was not relying on the inevitability of an inventory search pursuant to an impoundment, as there was no indication the car had been impounded. Finally, the government argued that the Court did not need to make credibility findings to decide the motion and asked the Court not to make such findings unless absolutely necessary.

**2.    The Court's ruling on the motion to suppress evidence**

The Court denied the motion to suppress in an oral ruling. The Court noted that Thompson had not disputed the propriety of the stop of his vehicle or the propriety of his arrest for driving under the influence. The Court also noted that it was undisputed that the Isuzu had never actually been impounded. In addition, the Court noted the

inconsistencies in the officers' testimony regarding where they saw the gun and where they were when they saw the gun.

The Court noted that Walter had testified that Maclaren was present in the store when he placed Thompson under arrest and handcuffed him; the Court indicated that it found that testimony "a little bit problematic." Feb. 4, 2008 Tr. 101. The Court further stated that it found Maclaren's testimony "somewhat problematic" due to his lack of recall. *Id.* For purposes of the motion, however, the Court determined – without making specific credibility findings – to credit Thompson's testimony regarding the sequence of events: he was taken into custody and handcuffed inside the store, and as he exited the store, Maclaren was already standing there holding the gun. If that was so, the Court stated, it was a strong indication that the search had taken place prior to Thompson's arrest.

The Court stated that "there was likely a showing that there was probable cause to believe that the car could contain contraband based on the evidence of the erratic driving and smell of alcohol on [Thompson's] breath" but declined to make a definitive decision on that point. *Id.* 104. Rather, the Court concluded, the government had shown that "a search incident to arrest was an inevitable result of this type of arrest and that the gun would have been found in that type of a search." *Id.* The Court acknowledged that the inevitable discovery doctrine requires "an appropriate showing that the search would have been done, and I think there is enough evidence here for the government to have established that a search incident to arrest would have happened maybe two minutes later than it did happen, but that it would have happened." *Id.* 105.

### 3.      Pretrial colloquy regarding certain evidentiary issues

Following the Court's ruling, there was a discussion about certain evidentiary

matters.  The government made an oral motion to preclude the defense from

questioning Walter at trial regarding a disciplinary finding in 1993 that he had made a

false statement in an internal police investigation.  Upon inquiry whether he intended to

go into this issue, defense counsel initially said, in effect, that he did not know:

> DEFENSE COUNSEL:  Well, your Honor, quite frankly, I have not spoken
> to my client about that.  I don't imagine that it is something that we did
> [sic] make a big part of the cross-examination.

*Id.* 108.  The Court thus deferred ruling on the matter but precluded defense counsel

from going into it in opening statement until the Court had a chance to rule.  Defense

counsel went on to state that he though he did not think it would be "that big of a deal"

in cross-examining Walter, he believed he should have the right to inquire regarding the

adverse finding because Walter's credibility would be a significant issue in the case.

*Id.* 109.  The Court discussed some of the potential issues and determined to table the

topic until later.

Before counsels' opening statements were delivered two days later, the

government told the Court that Walter had advised them that he had appealed the

adverse credibility finding and prevailed, and that the disciplinary action against him

was vacated.  Though the prosecutor had not obtained written confirmation of this, he

made a record of the point to give defense counsel fair warning that he would elicit this

testimony from Walter if defense counsel cross examined him on this issue.

**4.      The trial**

     **a.      The government's case**

A jury was selected on February 5, 2008, and the trial began the next day.  Prior to calling its first witness, the government introduced a stipulation that prior to January 21, 2006, Thompson had been convicted of a crime punishable by a term of imprisonment of more than one year.

Officer Walter, who testified as the government's first witness, essentially repeated his testimony from the suppression hearing regarding his observation of Thompson driving on the early morning of January 21, 2006, his initial encounter with Thompson when he approached the Isuzu in the 7-Eleven parking lot, his summoning of the other officers, and his conduct of the field sobriety tests.  Walter testified that while finishing up the third of four field sobriety tests, he saw Maclaren and Fraterrigo pull into the parking lot.  After completing the final field sobriety test, Walter testified, he placed Thompson under arrest, handcuffed him, and advised him of his rights, and he and Maclaren walked Thompson to the squad car and placed in the rear seat.  At that point, Walter said, Maclaren walked to the Isuzu and opened the door, while Walter sat in his car and ran a search of Thompson's license plate.

After a short interval, Maclaren signaled Walter to come to the Isuzu.  Walter got out of the squad car and asked Fraterrigo to stand by the car and watch Thompson and then walked to passenger side of the Isuzu and looked inside.  Maclaren was shining his light inside the car toward the rear of the driver's seat.  Walter said that he, too, shone his light in that area and saw "the butt of a semiautomatic pistol underneath the driver's seat."  Feb. 6, 2008 Tr. 35.  He directed Maclaren to take custody of the

weapon; Maclaren did so and brought the weapon to Walter, who examined it and then handed it back to Maclaren, who unloaded it. Walter identified as an exhibit the gun recovered from the Isuzu.

On cross examination, defense counsel elicited that Thompson was cooperative after Walter stopped him and that he had pulled over within thirty seconds after Walter turned on his siren. Walter stated that he pulled Thompson over because he was speeding and had driven into the oncoming lane of traffic. Asked if he had ticketed Thompson for those offenses, Walter said that he "gave [Thompson] many tickets for each and every offense, yes." *Id.* 41. When shown an abstract of Thompson's driving record that did not identify any such tickets, Walter said he believed state prosecutors had dropped those charges.

Walter further testified that he handcuffed Thompson while inside the 7-Eleven store and that Maclaren was "in the doorway" of the store when Walter walked Thompson out and opened the door for them. Asked whether Maclaren had ever entered the store, Walter said "[h]e was standing in the doorway as I finished the standard field sobriety test." *Id.* 42. Walter stated that when he later looked inside the rear of the Isuzu after Maclaren summoned him to the car, Maclaren was standing at the driver's side of the car, with the driver's door open, and Walter approached the rear passenger door. Walter repeated that what he saw was a gun underneath the back of the driver's seat and that he "could see the handle sticking out"; the gun was "underneath the rear of the seat," not on the floor behind the seat. *Id.* 44-45. Walter stated that he had not seen a gun in the car, on the front seat, or on the front floor when he first approached Thompson's car. He also stated that he never saw Thompson

reach behind the driver's seat.

Officer Maclaren, the government's second witness, testified that after being summoned by Walter, he drove with his partner to the 7-Eleven. After parking, he walked toward the door of the store, where he observed Walter conducting a field sobriety test. He waited inside the store near the doorway and then saw Walter escort Thompson toward the door. Maclaren and his partner followed Walter to his squad car, where Walter patted Thompson down, put him in handcuffs, and placed him in the back of the car. After Thompson was handcuffed, Maclaren and his partner did a "custodial search" of the car and found a pistol. *Id.* 50. The pistol was located "behind the driver's seat on the floor." *Id.* 51. He identified the gun in court. Maclaren stated that he later inventoried the pistol and the ammunition it had contained.

On cross examination, defense counsel again elicited from Maclaren that he had, in fact, entered the 7-Eleven store. Maclaren said he had begun to search Thompson's car while Walter was putting Thompson into Walter's squad car. According to Maclaren, the pistol was not underneath the driver's seat; rather, it was on the floor behind that seat. When he saw the gun, Maclaren said, he was standing outside the rear passenger side door, with the door open, looking in. That is when he asked Walter to come over to the car. Maclaren did not recall where Walter stood when he came to the car to look inside.

Herbert Keeler, a Chicago police department evidence technician, testified that he had tested the pistol for fingerprints and found none. He explained the properties of the pistol and other factors that decreased the likelihood that fingerprints would be left by someone handling the gun. Keeler stated that when he does testing on weapons

that are handled in a conventional manner, he never recovers identifiable fingerprints. Keller testified, on both direct and cross examination, that he had tested the weapon on May 3, 2006; defense counsel elicited that this was about three and one-half months after it was recovered.

Hamilton Beal, an agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, identified a certified copy of the title for the Isuzu, showing Thompson as the registered owner. Beal demonstrated how the pistol is loaded and how a round is chambered.

**b.    Colloquy prior to the defense case**

After Beal's testimony was completed, the government rested its case. After the Court denied Thompson's motion for a judgment of acquittal, the government sought to preclude testimony by Mrs. Thompson, and the Court inquired what topics Mrs. Thompson's testimony would involve. Defense counsel stated that the testimony would concern how the interior of the Isuzu is structured and, in addition, the fact that she had picked up the car and then picked up Thompson at the Cook County Jail. When the Court inquired why the latter topics were relevant, defense counsel stated that he intended to recall the police officers as witnesses to establish the procedures for impounding the car and to show their lack of credibility by questioning them with regard to the impoundment issue. The Court noted that typically it is inappropriate to call a witness simply to set up impeachment of that witness. Defense counsel stated that because the government had not inquired of these witnesses regarding the events following Thompson's arrest, he had believed that inquiry on cross examination would be outside the scope of the direct examination. The Court indicated that it did not agree

with that assessment.

Following further discussion, however, the Court concluded that

> the circumstances that [Mrs. Thompson] went to the police station, was
> given the car keys, went to the 7-Eleven, picked up the car and drove it
> home, I don't think that is unfairly prejudicial to the government.  I mean,
> it's sort of a non-event in the scheme of things standing by itself, okay.  So
> I am not going to preclude [the defense] from doing that.

Feb. 6, 2008 Tr. 97-98.  On the topic of recalling the police officers to set up

impeachment regarding the impoundment of the car – a topic the government had not

addressed in its questioning of the officers – the Court stated that the government had

> rested its case.  The witnesses weren't questioned about the subject of
> the impoundment or what happened to the car by either lawyer during the
> testimony of either Maclaren or Walter.  To call them back now simply to
> establish that Walter says . . . [that] the car was driven back to the police
> station and simply to set up than impeachment him by Mrs. Thompson
> . . . , I don't think you can appropriately do that now.  That is, as [the
> prosecutor] says, basically calling a witness simply to set up impeachment
> of that witness.  So I am not going to permit you to do that.

*Id.* 98-99.

Following the Court's ruling, Thompson himself expressed an objection, stating,

"Your Honor, I feel like I was ineffectively represented then.  This was established

yesterday.  Not one time did my attorney presented [sic] evidence to that, not one time."

*Id.* 100.  The Court understood this objection to concern defense counsel's failure to

impeach the police officers during their testimony in the government's case in chief.

Discussion ensued concerning other evidentiary issues the government raised

regarding potential defense witnesses.  The Court then took a break.  After the break,

the Court stated:

> The reason I took that break is I wanted to do a little bit further [sic]
> thinking about this issue that was discussed before that prompted Mr.

Thompson's comment.  Obviously, the witnesses are not here, and, you know, as I said before, . . . I am not going to make any kind of a judgment regarding the significance or materiality of the cross-examination or the potential cross-examination that I think probably could have been done during the cross of Walter and Maclaren.

But I will tell you I am a little bit concerned.  Mr. Thompson's comment gives me, I think, some legitimate concern about issues that could be remedied now, I think potentially, as opposed to having to deal with them at some later point down the road either in appeals of this proceeding or in some other form of a proceeding.

And I guess my inclination would be to permit [defense counsel] to, I think what I would call it is, reopen his cross of Officer Maclaren and Officer Walter for the limited purpose of establishing what happened to the car.  And he then either will or will not get the contradiction into evidence, but that is it because that is all I have been told about, is establishing this contradiction regarding what happened to the automobile afterwards.  I think it probably was and in all likelihood was within the scope or would have been within the scope.

*Id.* 108-09.

### c.    The defense case

Mrs. Thompson was the first defense witness.  She testified that she received a

call from a friend of Thompson, and then a call from Thompson himself, advising her

that he had been arrested.  Thompson remained in custody over the weekend and was

released a couple days later.  She picked him up in the Isuzu after he made bail.  Mrs.

Thompson testified that she had picked up the Isuzu at the 7-Eleven on January 21,

after an officer at the police station gave her the keys and told her where the car was.

She was not required to fill out any forms or pay a fee and was never told the car had

been impounded.  She said the name of the officer who gave her the keys began with a

"W" and that she believed it was officer Walter – as the officer told her that he had

Thompson in a back room and also told her what he had been charged with.

Mrs. Thompson testified that she drove the Isuzu on a daily basis. She described the car generally and then testified that it is impossible for the driver to place an object under the driver's seat because of non-removable electrical or other equipment that is part of the car and is located there. Mrs. Thompson identified several photos of the area under the driver's seat of the Isuzu that illustrated her testimony. She stated that this was the condition of the Isuzu on January 21, the date Thompson was arrested.

On cross examination, Mrs. Thompson said she did not remember the time on January 21 when she picked up the car keys. She also stated that the only space under the driver's seat of the Isuzu is the space needed for the equipment she had previously identified; there is no additional space. Mrs. Thompson testified that her husband drives the car and is the owner of the car.

The prosecutor then showed Mrs. Thompson the gun and asked, "[I]s this your gun?" *Id.* 132. Defense counsel objected and requested a sidebar. The following colloquy occurred at sidebar:

> DEFENSE COUNSEL: Mrs. Thompson is not being represented by counsel right now. She is being asked to admit potentially to a crime. She has a Fifth Amendment right not to be compelled, and she has not been advised of that right.
>
> THE COURT: What is the crime? Is the gun not registered or something? Is she a felon?
>
> DEFENSE COUNSEL: No, your Honor. However, no evidence has been – she has not testified as to whether or not she owns a FOID card or a gun card. And if I am not mistaken, it is still a crime, even if you do own a gun card, to carry a loaded gun.
>
> THE COURT: You're right about that.

DEFENSE COUNSEL:  It is a felony in the state of Illinois.

THE COURT:  It would seem to me that a way to handle this would be to let the jury go out and explain to her that she has a Fifth Amendment privilege and then find out if she wants to assert the Fifth Amendment privilege in response to that question, and we will find out what she is going to do, and then we will take it from there.

*Id.* 132-33.

After excusing the jury, the Court advised Mrs. Thompson as follows:

THE COURT:  Mrs. Thompson, I need to speak with you for a second.

The reason we had this discussion over at the sidebar and the reason that [defense counsel] made the objection was that the last question you were asked is whether it's your gun.

There is a potential that a yes answer to that question could incriminate you.  What I mean by that is that I believe – and it's my recollection – I don't think the law has changed in this regard – it's my recollection, from the days that I was practicing law, that it's illegal under Illinois law, not federal law, for anybody, whether they have been convicted of a crime or not, to carry a gun in a car, maybe even have a loaded gun on their person.

And I believe it's a crime under Illinois law for a person to – certainly a crime in the City of Chicago for a person to possess a gun that is not registered, and it is a state crime if you possess a gun if you don't have a firearm owner's identification card.  So there's various criminal offenses that could arise from you saying that this was your gun.

And what that means is that you have, under what is called [the] Fifth Amendment to the Constitution, the privilege against self-incrimination. You can't be required to incriminate yourself in response to a question.

So the reason we took the break is I wanted to make sure that you were aware that you have the right to remain silent with regard to this.  As you have heard people say before on the t.v. or elsewhere, anything say can and will be used against you in a court of law.  And, frankly, I guess – and I'm willing to give you a couple minutes to just kind of think about this, but I am going to need to know before the jury comes out whether you are going to answer the question or whether you are going to assert the Fifth Amendment because, depending on what you are going to do, I might have to have some further discussions with the lawyers.

*Id.* 133-35.

The Court then inquired of the lawyers whether they thought Mrs. Thompson

should be told anything more.  Defense counsel stated:

> DEFENSE COUNSEL:  Yes, your Honor.  Just for the record, it's actually
> our position that Mrs. Thompson should not be required to answer that
> question.  And the reason for that is, even if she chooses to answer the
> question and says – let's say she says, "no, it wasn't my gun," still, if that
> very issue in this Court right now could – potentially I will say if my client is
> acquitted and for whatever reason the state decides to pursue a gun case
> against Mr. Thompson or –

*Id.* 135.  Based on defense counsel's comments, the Court then gave Mrs. Thompson

the following additional caution:

> THE COURT:  Let me just add one thing to what I said.  When I said
> "anything you said can and will be used against you," even if you said
> "no," it could somehow be used against you at some point in time.  In
> other words, somebody could try to – if [sic] they could try to prove that it
> was your gun and then try to prosecute you for perjury, or they could – if
> they were able to prove that it was your gun in some other way, you could
> be prosecuted for having the gun, and your answer here could use used
> against you to show that you had tried to cover it up or things along those
> lines.  I think that is essentially what [defense counsel] is trying to get
> across.

*Id.* 135-36.

The Court then asked Mrs. Thompson whether she would like a few minutes to

think, but she immediately stated, "I think I will plead the Fifth."  *Id.* 136.  Following this

response, the lead prosecutor stated that the government would withdraw the question

that had led to the extended colloquy.  The Court then asked defense counsel whether

he intended to pursue the issue on redirect.  Despite having objected to the inquiry by

the government, defense counsel stated, "Yes, your Honor.  The government opened

[it] up."  *Id.* 137.  The Court replied that because the question was being withdrawn, and

the Court intended to instruct the jury to disregard the question, the door would be closed, and because defense counsel had not inquired about the topic on direct examination, any such inquiry on redirect would be outside the scope of both the direct and the cross.

The Court then had the jury brought back into the courtroom and stated,

Okay, I need to speak to the jurors a second. The last question that was asked right before you took the break has been withdrawn by the government. You are directed to completely disregard that question, wipe it from your mind. You are not to consider it in any way, shape, or form.

*Id.*

The government completed its cross examination of Mrs. Thompson by establishing that she was not with her husband at 3:30 a.m. or 4:00 a.m. on the early morning when he was arrested. On redirect, defense counsel elicited that she had been with him earlier that night, before he left for a party, and that before he left she did not see Thompson with a gun and did not see a gun in the Isuzu. Counsel then asked her, "Have you seen a gun in your SUV?" *Id.* 139. This question prompted the Court to request a sidebar on its own motion. At the sidebar, the Court advised counsel that in its view, this was simply another way of asking Mrs. Thompson whether the gun was hers. The Court indicated that if the question were pursued, the Court would have to take another break and advise Mrs. Thompson that if she had seen a gun in the Isuzu, that could constitute an admission that she had a gun. The Court went on to state that it believed the question was outside the scope of the cross examination and thus would strike the question. *Id.* 140. The Court then directed the jury to disregard the question.

Defense counsel next called Craig Lewis, who said that Thompson was a family

member of his best friend and that he had known Thompson for about fifteen years.  He stated that on January 20, 2006, Thompson picked him up about 9:15 p.m. in the Isuzu.  They stayed at Lewis's house for an hour or more and then left in the Isuzu to pick up two other people.  Lewis sat in the front seat on the passenger side.  On the way home, Lewis drove "because I wanted to leave" the party they attended.  He said that he did not see Thompson with a gun that evening and did not see him place a gun in the Isuzu.  He said he had not been in the back seat.  There were a total of four people in the car when they left the party.  On cross examination, Lewis stated that he last saw Thompson about 2:30 a.m. and that there were three people left in the Isuzu when he was dropped off.  He also stated they were at the party about two and one-half hours.  On redirect, Lewis stated that at the time, he lived in the Humboldt Park neighborhood of Chicago and that the other two people were picked up in the vicinity of Division Street and Laramie Avenue.  The other two men sat in the back seat both going to and coming from the party.

The defense next called Lorese Howery, who testified that Thompson is the cousin of her former boyfriend and that the party Thompson attended on the early morning of January 21 was a birthday party for her former boyfriend's brother.  The party lasted until about 5:00 a.m. and was held at the Windy City Lounge at Cicero and North Avenues.  She said she had seen Thompson that evening and did not see a gun on him.  She believed Thompson left the party around 1:30 or 2:00 a.m., but she was not certain.  On cross examination, Howery stated that she had not seen Thompson after he left the party and that she was not paying attention to him the entire time he was at the party.

At the conclusion of proceedings (outside the jury's presence), the prosecutor asked to put on the record what the scope of defense counsel's re-examination of officers Walter and Maclaren would be. The Court stated that it had ruled that defense counsel could elicit testimony regarding what happened to the Isuzu after they left the 7-Eleven following Thompson's arrest, regarding whether the car was impounded, and regarding the return of the car keys. Defense counsel did not raise any objection or indicate any concern regarding this scope of examination. *Id.* 170-71.

The following morning, the Court advised the jury that it had permitted the defense to reopen its questioning of officer Maclaren. Defense counsel elicited from Maclaren that it is Chicago Police Department policy to impound the car of a person arrested for driving under the influence. Maclaren stated that Thompson's car was impounded and that when a car is impounded it is towed to a police pound. He did not know where Thompson's car was towed from, but when shown an impoundment form concerning the Isuzu, he stated that according to the form, the car was towed from 2452 West Belmont (the Belmont and Western police station). Asked how the car got there, Maclaren said "[i]t was driven" but did not recall if he had driven it. Feb. 7, 2008 Tr. 178. He said it was unlikely that Walter had driven the car; Maclaren did not recall if his partner, officer Fraterrigo, had driven it. Maclaren said he was unfamiliar with the procedures for an owner to retrieve an impounded car.

On cross examination, the government showed Maclaren one of the photographs of the Isuzu interior introduced by the defense;[1] he identified where he had first seen

---

[1] The Court permitted the government to elicit on cross examination what technically might have constituted rebuttal evidence, to save time due to the fact that the officers were scheduled to appear in

the gun – indicating a spot approximately straight down from the lower rear edge of the front seat structure.  On redirect by defense counsel, Maclaren again said that he saw the gun behind the seat, not underneath the seat.  Defense counsel then attempted to impeach Maclaren with his earlier testimony regarding where he had seen the gun.

The defense next recalled Walter, after the Court gave a similar instruction to the jury regarding the reopening of his cross examination.  Walter stated that it is police policy to impound a car once a person is arrested for driving under the influence or if a gun is found in the car.  He stated that Thompson's car was impounded and that when a car is impounded it is towed to a police auto pound.  Walter testified that Thompson's car was towed to the police pound from the Belmont and Western police station.  He said he did not see who drove the car from the 7-Eleven to the police station.  Defense counsel impeached Walter with his testimony from the suppression hearing that Maclaren had driven the car.  Walter further testified – similar to his testimony in the suppression hearing – regarding the procedures for an owner to retrieve an impounded car.

Defense counsel then asked Walter, "Officer Walter, have you ever given a false statement?"  *Id.* 190.  The Court sustained the government's objection to this question and then called counsel and the defendant to sidebar.  The Court noted that defense counsel had asked to reopen the cross examination for the limited purpose of dealing with questions regarding who had driven the car and the impoundment and that it had been made clear twice the previous day that those were the subjects that would be

state court later in the day.

22

permitted.  The Court stated that counsel had now gone into a different topic and that "I am not going to permit that at this point. . . .  The point has been forfeited.  If there is any remedy for that, it is going to be at another place and another time."  *Id.* 191.  Mr. Thompson demurred, but the Court rejected his objection.  The Court then instructed the jury to disregard defense counsel's question.

The defense rested its case after reading a stipulation that a federal agent would testify that on April 21, 2006 she submitted a request to the Chicago Police Department's forensic section asking for the gun to be examined for the presence of fingerprints; between September 2006 and June 2007, she made a series of calls inquiring about the status of this; and on June 11, 2007, a Chicago Police Department technician advised that he had test fired the gun on January 24, 2006 and had never gotten a request to examine the gun for fingerprints.

The jury convicted Thompson on the section 922(g)(1) charge.  Following trial, Thompson retained new counsel, who has filed an admirably thorough set of post-trial motions.

## Discussion

### 1.    Motion for judgment of acquittal

Thompson seeks entry of a judgment of acquittal on the ground that the evidence was insufficient to prove he possessed the gun.  In deciding this motion, the Court considers the evidence in the light most favorable to the government and may enter a judgment of acquittal only if no reasonable jury could have found the essential elements of the crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Thompson did not have the gun on his person, but a person need not be in physical contact with an object to possess it. *See, e.g., United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008). Possession exists when a person knowingly has the power and intention to exercise direction or control over an object. *Id.* Evidence that a person owns the property (in this case an automobile) where an object is recovered, actually occupies that property, and controls access to the property, is sufficient to prove possession. *See id.*

On the other hand, a person's mere presence in a location where an object is found is insufficient, without more, to establish constructive possession. *See, e.g., United States v. Quilling*, 261 F.3d 707, 712 (7th Cir. 2001). The government must establish "'a nexus between the accused and the contraband, in order to distinguish the accused from a mere bystander.'" *Id.* (quoting *United States v. Richardson*, 208 F.3d 626, 632 (7th Cir. 2000)).

The evidence showed that Thompson owned the vehicle, was driving the vehicle when the gun was found there, and, as the owner and sole occupant of the vehicle, controlled access to it at that time. That was sufficient to prove his constructive possession of the gun. Thompson argues that the government failed to prove that he *knowingly* possessed the gun, and the Court acknowledges that there was no direct evidence of Thompson's knowledge. But the jury reasonably could have inferred from the evidence the government introduced, taken in the light most favorable to the government, that the gun was visible on the floor behind the driver's seat and that Thompson, as the owner and driver of the car, had to be aware it was there.

The Court acknowledges Thompson's contentions regarding inconsistencies and

arguable improbabilities in Walter's testimony. These contentions, taken together, are insufficient to make Walter's testimony unreliable as a matter of law. A witness's testimony is incredible as a matter of law only if it is physically impossible for the witness to have observed what he claims to have observed or it is impossible under the laws of nature for the matters he described to have occurred. *See, e.g., United States v. Bailey*, 510 F.3d 726, 733 (7th Cir. 2007). Such was not the case with regard to Walter's testimony. Rather, the believability of his testimony was a matter appropriately determined by the jury, not the Court.

For these reasons, the Court denies Thompson's motion for a judgment of acquittal.

## 2. Motion to arrest judgment

Thompson moves to arrest judgment on the ground that the government constructively amended the indictment by seeking a conviction on the basis of constructive and/or joint possession even though the indictment did not refer to either theory. The Court denies the motion. As a general rule, if the indictment tracks the language of the pertinent statute – in this case by alleging possession – that is sufficient. *See, e.g., United States v. Smith*, 230 F.3d 300, 305 (7th Cir. 2000). The Court is unaware of any case, and Thompson has cited none, supporting the proposition that an indictment in a case involving possession must set forth the particular theory (actual or constructive, sole or joint) on which possession is claimed. In any event, "there is no legal difference here between actual and constructive possession." *Moses*, 513 F.3d at 733. Because the indictment simply alleged possession, it was not constructively amended by the government's reliance on a

theory of constructive possession rather than actual possession.

**3.      Motion for new trial**

Thompson has moved for a new trial on the following grounds:  the verdict was against the weight of the evidence; the Court should have granted the motion to suppress the gun; the Court's warnings to Mrs. Thompson improperly chilled her from giving exculpatory testimony; the Court should have allowed counsel to reopen his cross examination of Walter concerning the earlier false statement; the government violated *Brady v. Maryland*; and trial counsel rendered constitutionally ineffective assistance.

**a.      Weight of the evidence**

A court may order a new trial in a criminal case if the verdict was against the manifest weight of the evidence, even if the evidence was sufficient to convict the defendant.  In addressing such a motion, "a court may properly consider the credibility of the witnesses, and may grant a new trial if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice."  *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999).  "If the complete record, testimonial and physical, leaves a strong doubt as to defendant's guilt, even though not so strong a doubt as to require a judgment of acquittal, the district judge may be obliged to grant a new trial."  *Id.*  A court considering such a motion

> must consider the weight of the evidence, and must grant a new trial if
> that evidence "preponderates heavily against the verdict, such that it
> would be a miscarriage of justice to let the verdict stand."  In considering
> the weight of the evidence, the court must necessarily consider the
> credibility of the witnesses.

*Id.* at 657-58 (quoting *United States v. Reed*, 875 F.2d 107, 113 (7th Cir. 1989)).

This was not exactly the strongest case of constructive possession that one might imagine. The believable evidence indicated that the gun was found not behind the driver's seat but partially under the driver's seat. Given the configuration of the equipment under the driver's seat, the gun could only have been put there from the rear. There was no evidence suggesting that someone sitting in the driver's seat could have put the gun were it was found by reaching around while sitting – and in any event, officer Walter did not see the defendant reach or move while following him. For these reasons, it is highly likely that the gun was placed there by someone who was sitting in the back seat or at least had access to that area through one of the rear doors. This, combined with the evidence that Thompson had two passengers in the back seat in the hours preceding his arrest, supported a theory that the gun was placed there by someone other than Thompson. That, of course, does not mean that Thompson did not constructively possess the gun – it did not have to be his gun for him to be deemed to have possessed it – but it lends support to his contention that he had no idea the gun was there and thus could not have knowingly possessed it, constructively, jointly, or otherwise.

That said, the evidence introduced at trial did not "preponderate[ ] *heavily* against the verdict," *Washington*, 184 F.3d at 658 (emphasis added), even after one gives due consideration to the requirement that the government prove each essential element of the crime beyond a reasonable doubt. The case was close, but the jury's determination was not against the manifest weight of the evidence.

**b.    *Brady v. Maryland***

In his motion for new trial, Thompson argued that the government may have

failed to disclose evidence regarding the ownership of the pistol and a possible videotape of the stop and arrest from a camera that may have been in Walter's squad car. The government denies having, knowing about, or suppressing such evidence. Thompson's contentions find no support in the record. He is not entitled to a new trial on this basis.

### c. Reopening of cross examination of Walter

Thompson argues that having permitted defense counsel to reopen his cross examination of officer Walter on the impoundment issue, it should have permitted counsel to question Walter regarding the 1993 disciplinary finding that he had made a false statement to police investigators. Thompson's counsel made no mention of this point when he first raised the issue of recalling Walter and Maclaren to question them about the impoundment issue. And later that same day, when the government asked the Court to delineate what points defense counsel could cover in the reopened cross examination, the Court made no mention of the false statement issue – as the defense had not brought it up – and neither did defense counsel.

When Walter resumed the witness stand the next day, however, counsel attempted to address the false statement issue during the course of his examination – without giving any prior indication that he planned to do so. It is relatively clear from the context and from the Court's observation of the demeanor of Thompson's counsel at the ensuing sidebar that counsel had forgotten to bring up this point in the two earlier discussions. In other words, there is nothing to suggest that counsel had made a strategic decision to forego the point; rather, he simply forgot about it until Walter was actually back on the witness stand.

If the Court had it to do all over again, it likely would have allowed defense counsel to inquire on this point during the reopened cross examination of Walter. This would not have unfairly prejudiced the government (as it had been aware of the possibility the issue would come up before Walter took the stand in the government's case in chief) and the amount of additional time the inquiry would have taken would have been minimal.

That said, the Court did not err or unfairly prejudice Thompson by declining to allow defense counsel to bring up the issue after he had bypassed it. Counsel had the opportunity to question Walter in full during his original cross-examination, but he failed to do so. Thompson was not entitled to recall Walter for the sole purpose of impeaching him, *see, e.g., United States v. Giles*, 246 F.3d 966, 974 (7th Cir. 2001), and his entitlement to do so is not affected by the fact that the Court permitted the recalling of Walter for a different purpose.

### d.     Perjury warning to Mrs. Thompson

Via his new counsel, Thompson seeks a new trial on the ground that the Court's comments to Mrs. Thompson during her cross-examination improperly chilled her from providing exculpatory testimony. The problem with this argument as a basis for a new trial is that the Court acted as it did at the request of Thompson's trial counsel. When an error is invited by the defense, not even the plain error rule permits reversal of a conviction. *United States v. Hall*, 109 F.3d 1227, 1231 (7th Cir. 1997); *United States v.*

*Fulford*, 980 F.2d 1110, 1116 (7th Cir. 1992).[2]

Even were the alleged error not invited, the Court's warnings to Mrs. Thompson would not entitle Thompson to a new trial. First, the Court's statement to Mrs. Thompson that her answer to the question whether the gun was hers could incriminate her was accurate advice and was not unduly heavy-handed. In *United States v. George*, 363 F.3d 666 (7th Cir. 2004), the defendant, George, faced various counterfeiting and fraud charges. One of his co-schemers, Amin, had entered into a plea agreement and had implicated George in testimony before the grand jury. George wanted to call Amin to testify at trial that he had lied about George's involvement in the fraud schemes. In court, Amin's attorney told him that if he so testified, he risked revocation of his plea agreement as well as a charge of perjury. The trial judge confirmed this, as did the prosecutor. Amin declined to testify. After he was convicted, George argued that Amin had been improperly intimidated into refusing to testify, depriving George of exculpatory evidence. On appeal, the Seventh Circuit acknowledged that a defendant's Sixth Amendment right to present a defense may be violated if governmental interference prevents a defense witness from testifying but also noted the countervailing interest that a witness may have, under the Fifth Amendment, to decline to incriminate himself. *Id.* at 670-71. The court stated that the issue in George's case was "whether the prosecutor's and court's warnings were appropriate to

---

[2] In this regard, the Court's post-trial order asking defendant to address this issue in his post-trial motions was incorrect; the Court indicated in that order that the plain error rule might require addressing the issue even though no objection was made at trial. *See* Order of Feb. 20, 2008. The order may, however, have had the salutary effect of encouraging Thompson's new counsel to argue that trial counsel committed ineffective assistance in his actions vis-à-vis Mrs. Thompson, an argument the Court will address in the next section of this decision.

protect Amin's right to assert his Fifth Amendment privilege, or whether they were an intimidation tactic employed to interfere with George's right to call Amin as a witness." *Id.* at 671. It concluded that the actions of the prosecutor and the court "were a necessary conveyance of information so as to allow Amin to make an educated decision regarding his Fifth Amendment rights." *Id.* The court stated that the trial judge and prosecutor "merely corroborated, in a straight-forward and nonthreatening manner, the information given by Amin's attorney. Given the plainly incriminatory nature of the proposed testimony, it is evident that Amin's assertion of his Fifth Amendment privilege was well considered." *Id.*

*George* is consistent with numerous other decisions holding that a trial judge "has the inherent discretion to warn a witness about his constitutional rights, especially if the court perceives that the witness might incriminate himself." *United States v. Valdez*, 16 F.3d 1324, 1330-31 (2d Cir. 1994) (citing cases from the Third, Fifth, Sixth, and Seventh Circuits). In view of Mrs. Thompson's testimony that she regularly used the Isuzu and Thompson's testimony during the suppression hearing indicating his surprise when shown the gun outside the 7-Eleven store, *see* Feb. 4, 2008 Tr. 64, the Court reasonably perceived that the question the prosecutor asked Mrs. Thompson could implicate her privilege against self-incrimination. The Court's initial comments to her regarding that privilege, *see* Feb. 6, 2008 Tr. 133-35, communicated in a straightforward and unintimidating manner the potentially incriminating implications of the prosecutor's inquiry and the fact that Mrs. Thompson had a privilege against self-incrimination. For these reasons, these initial comments do not entitle Thompson to a new trial.

Thompson argues, however, that the Court's follow-up warnings regarding the possibility of a perjury prosecution were unnecessary, improper, and intimidated Mrs. Thompson into declining to testify about her knowledge of the gun. Though, as noted earlier, a court has the discretion to warn a witness about the self-incriminating implications of her testimony, the "exercise of this discretion must be carefully tailored to ensure that warnings do not become threats. A district judge warning a witness must be sure that she does not abuse that discretion by intimidating a witness into silence." *Valdez*, 16 F.3d at 1331.

The Court's perjury admonition distinguishes this case from *George* and others like it, necessitating further analysis. The Court first recaps the sequence of events. After the Court advised Mrs. Thompson that her response to the prosecutor's question about whether the gun was hers could incriminate her, defense counsel advised the Court in Mrs. Thompson's presence that she "should not be required to answer [the prosecutor's] question" because even if she denied the gun was hers, the authorities could seek charges against her if, for example, Thompson were acquitted. Feb. 6, 2008 Tr. 135. The Court in effect adopted counsel's request and advised Mrs. Thompson that a denial that the gun was hers could be used against her – for example, to prosecute her for perjury, or by using a false denial in a later prosecution for possession of the gun. *Id.* 135-36. Upon hearing this warning, Mrs. Thompson immediately advised the Court that she would "plead the Fifth." *Id.* 136.

Mrs. Thompson says in her affidavit that when she took the witness stand at trial, she did not expect to be asked about the gun. After she heard the Court's perjury warning, she decided not to answer the prosecutor's question. Mrs. Thompson says

that she did not fully understand what the Court was saying but that the Court's statement that her testimony could lead to a perjury charge made her decide not to testify. Mrs. Thompson expresses concern that if asked about the gun, the person she believes is the owner (Paris Fleming) would deny it is his – and she says that this, combined with the Court's warning, put her in fear of a perjury prosecution.[3]

The Court agrees with the government's assertion that the Court dealt with Mrs. Thompson politely and gave her an opportunity to consider her choice of action. But advice coming from someone sitting on a judge's bench and wearing a black robe, even if polite, can carry significant weight with a witness. *Cf. Webb v. Texas*, 409 U.S. 95, 98 (1972) (per curiam) (noting the "great disparity between the posture of the presiding judge and that of a witness in these circumstances"). Given the sequence of events and the Court's contemporaneous observation of Mrs. Thompson's demeanor, the Court has little doubt that it was the perjury-based warning, perhaps combined with defense counsel's comments, that triggered Mrs. Thompson's decision to claim her privilege against self-incrimination. That is what Mrs. Thompson says in her affidavit, and her statement on that point is uncontradicted.

The question, however, concerns whether the Court acted improperly, not whether its comments led Mrs. Thompson to claim (properly or otherwise) her privilege against self-incrimination. Having considered the matter, the Court does not believe that its warning about perjury crossed the line of propriety, though it may have come

---

[3] Mrs. Thompson says she has now consulted with counsel and is aware of the risks she faces from stating that she facilitated the transfer of the gun to Fleming but is nonetheless willing to waive her Fifth Amendment privilege. Eunice Thompson Affid. ¶ 14.

somewhat closer than the government seems to suggest. In this regard, the case is nothing like *Webb* (which Thompson cites), in which the Supreme Court overturned a defendant's conviction due to the trial judge's intimidation of a defense witness regarding the possibility the witness could be charged with perjury if he testified. In *Webb*, the trial judge, acting without prompting, told the sole defense witness that

> you don't have to testify, that anything you say can and will be used against you. If you take the witness stand and lie under oath, *the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood (sic) is that you would get convicted of perjury* and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. *If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve. It will also be held against you in the penitentiary when you're up for parole* and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but *if you lie you can get into real trouble*. The court wants you to know that. *You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.*

*Id.* at 95-96 (emphasis added).

Unlike in *Webb*, the Court did not "gratuitously single[ ] out" Mrs. Thompson "for a lengthy admonition on the dangers of perjury." *Id.* at 97. Rather, the Court simply advised her, following a request by defense counsel, that if she testified falsely, her testimony could be used to prosecute her for perjury or could be used against her in a prosecution for gun possession. The Court did not use "unnecessarily strong terms [that] could well have exerted such duress on the witness' mind as to preclude [her] from making a free and voluntary choice whether or not to testify." *Id.*

As the Fifth Circuit has stated, "it is not improper *per se* for a trial court judge or prosecuting attorney to advise prospective witnesses of the penalties for testifying

falsely." *United States v. Viera*, 819 F.2d 498, 503 (5th Cir. 1987) (quoting *United States v. Blackwell*, 694 F.2d 1325, 1334 (D.C. Cir. 1982)).  Though "warnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify," *id.*, that did not occur in this case; the Court did not unduly emphasize the perjury warning in its admonitions to Mrs. Thompson.  The single admonition that the Court gave to Mrs. Thompson did not deprive Thompson of due process, his right to a fair trial, or his right to call witnesses in his defense.

If, however, the Court had it to do all over again, it likely would have not added the perjury warning to its admonition to Mrs. Thompson regarding her Fifth Amendment privilege.  As Thompson points out, no one has the constitutional right not to testify on the ground that she will lie and thus be subjected to a perjury prosecution.  *See, e.g., United States v. Vavages*, 151 F.3d 1185, 1192 n.3 (9th Cir. 1998) (fear of perjury prosecution is valid basis for invoking Fifth Amendment privilege only if risk involves prosecution for perjury in witness's *past* testimony); *United States v. Whittington*, 783 F.2d 1210, 1218 (5th Cir. 1986) (same).  And as the Second Circuit has stated, "[o]nce a witness swears to give truthful answers, there is no requirement to warn him not to commit perjury or, conversely to direct him to tell the truth.  It would render the sanctity of the oath quite meaningless to require admonition to adhere to it." *United States v. Winter*, 348 F.2d 204, 210 (2d Cir. 1965) (internal quotation marks omitted), *quoted in Webb*, 409 U.S. at 97 n.*.  Thus, though the Court's warning was neither improper nor intimidating, it likely was unnecessary.

**e.    Ineffective assistance of trial counsel**

Thompson argues that his trial counsel rendered ineffective assistance in violation of Thompson's Sixth Amendment rights, by failing to interview Mrs. Thompson about her knowledge regarding the gun; by objecting to the government's question to Mrs. Thompson regarding whether the gun was hers; by failing to conduct follow-up investigation that would have shown Walter's testimony about giving Thompson citations was false; and by forgetting to impeach Walter regarding his prior false statement.

To prevail on his ineffective assistance claim, Thompson must show that "counsel's representation fell below an objective standard of reasonableness" and that "any deficiencies in counsel's performance [were] prejudicial to the defense." *Strickland v. Washington*, 466 U.S. 668, 687-88, 692 (1984). The prejudice aspect of the *Strickland* standard requires Thompson to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

**i.    Failure to interview Mrs. Thompson regarding the gun**

With his motion for a new trial, Thompson has submitted an affidavit from Mrs. Thompson, who says that neither Thompson's trial counsel nor his original appointed counsel ever asked her about the gun – including where it came from. If asked, Mrs. Thompson says, she would have told counsel that in 2003 or 2004, a co-worker of hers named Paris Fleming, who also knew Thompson, was shot in a dispute with the former boyfriend of a former girlfriend. Fleming then went to Thompson and asked if he had a gun; Thompson said no. Mrs. Thompson was present and said nothing, but a few days

36

later, she told Fleming that a friend of hers had a small caliber gun – a Baretta – that he wanted to get rid of. According to Mrs. Thompson, she was present when Fleming later acquired this gun.

Mrs. Thompson says in her affidavit that after Thompson was arrested, he told her that three men, identified as Craig, "Ace," and "Maniac," were in the car and that either Ace or Maniac had to have left the gun there. "Ace" is Paris Fleming. Mrs. Thompson says that when her husband told her this, she thought the gun might be Fleming's, but she did not tell Thompson because she was not positive and did not want him to get mad at her for helping Fleming get the gun in the first place.

Just before trial, Mrs. Thompson says, Thompson told her what type of gun he was charged with possessing. She now believes it is the gun that she helped Fleming get back in 2003 or 2004. Though Mrs. Thompson concedes she cannot make a completely positive identification, she says in her affidavit that it appears to be the same type of gun. There is no indication that she told Thompson this at any time before or during the trial. Indeed, Mrs. Thompson did not think she needed to tell him; she says that based on what trial counsel told her, she did not think her husband would be convicted. In short, Thompson was unaware that his wife had exculpatory evidence.

Based on the record, the Court also finds that neither Thompson's initial counsel nor his trial counsel asked Mrs. Thompson any questions about the gun or its source.[4] This, despite the fact that trial counsel clearly knew Mrs. Thompson had daily access to and often drove the Isuzu – as reflected by the fact that Thompson's trial counsel

_____

[4] Upon inquiry by the Court on April 23, 2008, neither the government nor Thompson sought an evidentiary hearing on Thompson's post-trial motions. The Court thus relies on the record as it now stands.

elicited such testimony from Mrs. Thompson at trial.  *See* Feb. 6, 2008 Tr. 118.

The government does not challenge Thompson's contention that trial counsel's failure to interview Mrs. Thompson regarding the gun and his failure to elicit testimony from her on that point amounted to performance below an objective standard of reasonableness.  Nor does the government argue that Mrs. Thompson's testimony regarding the gun would have been inadmissible at trial.[5]  *See* Govt. Mem. at 12.  And for good reason.

First, because the gun was found in the car when Thompson was driving it, his only plausible defenses at trial were that the fact the gun was in his car was insufficient to prove constructive possession or that he did not *knowingly* possess the gun, constructively or otherwise.  Under the circumstances, trial counsel's failure to interview Mrs. Thompson about her knowledge regarding the gun is as inexplicable as it is objectively unreasonable.  A defense theory that someone other than Thompson had, unbeknownst to him, left the gun in the Isuzu would have been fairly obvious to even the most inexperienced criminal defense attorney.  Defense counsel was undeniably aware that Mrs. Thompson drove the car on a daily basis, *see supra* at 15 – including, presumably, earlier in the day on Friday, January 20, 2006 (Thompson was arrested around 4:00 a.m. the next morning, January 21).  Given her daily use of the Isuzu, Mrs. Thompson was an obvious subject for an interview regarding whether she had seen a gun in the car and, more generally, whether she had any idea where the gun came

---

[5]  Rather, the government's sole argument regarding this issue is that Thompson was not prejudiced by trial counsel's failure to interview or call Mrs. Thompson.  Govt. Resp. at 11-13.  As a result, the government has forfeited any argument that trial counsel's performance in this regard was not ineffective or that her testimony would have been inadmissible.

from.  Had counsel interviewed her regarding those relatively elementary points, he would have elicited the statements Mrs. Thompson now makes in her affidavit.

In addition, there is little doubt the Court would have admitted at least the significant aspects of Mrs. Thompson's testimony about Paris Fleming and the gun despite her less than complete certainty that the gun found in the car was the same one she had seen in Fleming's possession.  Mrs. Thompson had personal knowledge that Fleming, an occupant of the rear seat on night of January 20-21, had a gun similar in appearance to the one found in the Isuzu.  That, combined with her testimony tending to show that the gun likely had to have been placed where it was found from the rear seat area, would have made her testimony about the gun relevant and highly probative on the issue of Thompson's knowledge (an element of the offense, *see* Jury Instructions at 12, 15), and thus admissible.

In sum, even had the government disputed the point, it would be clear that the failure of Thompson's trial counsel to inquire of Mrs. Thompson regarding her knowledge about the gun amounted to performance well below an objective standard of reasonableness.  *Cf. Davis v. Lambert*, 388 F.3d 1052, 1063-64 (7th Cir. 2004) (when counsel presented a self-defense theory at trial, his failure to interview the only other eyewitness to the fight at issues in the case amounted to ineffective assistance); *see also, Strickland*, 466 U.S. at 691 (criminal defense attorneys owe their clients "a duty to make a reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary"); *Crisp v. Duckworth*, 743 F.2d 580, 583 (7th Cir. 1984) ("as a general rule an attorney must investigate a case in order to provide

minimally competent professional representation.").[6]

Having shown ineffective assistance, Thompson must show that his trial counsel's unprofessional performance prejudiced his defense, specifically, that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. The Court has no difficulty making that finding in this case. In view of how close the case was on the question of Thompson's knowing possession of the gun (constructive or otherwise), he likely would have been acquitted had Mrs. Thompson's testimony been introduced.

The government argues that Thompson was not prejudiced; it contends that Mrs. Thompson would not testify at a retrial because if "adequately counseled," she likely would again assert her privilege against self-incrimination. Govt. Mem. at 12. Mrs. Thompson's statements in her affidavit are fatal to that contention; indeed, her submission of the affidavit itself undermines the government's argument. In the affidavit, Mrs. Thompson has specifically affirmed that she is waiving any self-incrimination privilege she may have, despite her awareness of the risks she might face. Eunice Thompson Affid. ¶¶ 13-14.

The government also argues that Mrs. Thompson's testimony would have prejudiced the defense and conversely that her failure to testify regarding the gun

---

[6] The Court also notes that it is a basic, routine step for reasonable trial attorneys to question witnesses they intend to put on the stand to explore possible areas of cross examination. A key thrust of trial counsel's direct examination of Mrs. Thompson was that the gun could not have been put where it was found from the front seat – an attack on constructive possession and arguably on the claim that Thompson knowingly possessed the gun. It was therefore entirely predictable that she would be asked on cross examination about her awareness of the gun. Any reasonable defense attorney would have wanted to know, before exposing Mrs. Thompson to cross examination, what she would say if asked about the gun: whose was it? how did it get there? had she ever seen it before? was it Thompson's? was it hers? But Thompson's trial counsel put her on the stand blithely unaware of her answers to any of those questions.

helped the defense.  *See* Govt. Mem. at 6, 12.  This argument does not hold water.
According to the government, testimony by Mrs. Thompson suggesting that Thompson,
a convicted felon, was with someone on the night of January 20-21 who himself was a
felon[7] and was carrying a gun, and was also with another man whose nickname was
"Maniac," "is unlikely to have endeared defendant, or his wife, to the jury and would
lend additional support to the government's argument that defendant and his friends . . .
were acting in concert that night."  *Id.* at 12.  The disputed issue in the case involved
knowing possession, not whether Thompson – whom the jury already knew to be a
convicted felon – was an "endearing" character.  Mrs. Thompson's testimony would
have provided a solid basis for an alternative theory of how the gun got into the car – it
was left there by a passenger – and would have lent powerful support to the proposition
that Thompson had no idea it was there.  But based on what actually was introduced at
trial, this alternative theory, though counsel touched on it in his closing argument, *see*
Feb. 7, 2008 Tr. 218, had no grounding in the evidence.  In any event, based on the
record as it now stands, there would have been no basis in the evidence for the
government to argue to the jury that Thompson and Fleming were somehow "acting in
concert" vis-à-vis the gun for some nefarious purpose or otherwise.  The Court would
have not have permitted the government to make such an argument to the jury.

    Trial counsel's failure to interview and call Mrs. Thompson to testify regarding
her knowledge regarding the gun by itself requires the Court to grant Thompson a new
trial based on the prejudicial violation of his Sixth Amendment right to effective

---

[7]  The Court assumes that the government refers to Fleming as a felon because Mrs. Thompson said in her affidavit that she was aware Fleming had served time in prison.

assistance of counsel.

### ii.    Advocacy of Fifth Amendment warnings to Mrs. Thompson

Thompson argues that in asking the Court to admonish Mrs. Thompson regarding her privilege against self-incrimination and the risk of a perjury prosecution, his trial counsel in effect acted as her counsel, not his, thereby violating counsel's duty of loyalty to Thompson, his client, and displaying that he labored under a conflict of interest.  Thompson cites this as another instance of ineffective assistance of counsel.

The Sixth Amendment guarantees to a defendant counsel who is unimpaired by a conflict of interest.  *Glasser v. United States*, 315 U.S. 60, 70 (1942).  Under *Mickens v. Taylor*, 535 U.S. 162 (2002), to show a Sixth Amendment violation for conflict of interest, Thompson must show that his trial counsel had an actual conflict of interest that adversely affected his performance.  *Id.* at 174.  An actual conflict of interest exists when an attorney actively represents incompatible interests; it is more than a "mere theoretical division of loyalties."  *Id.* at 171; *see United States v. Fuller*, 312 F.3d 287, 291 (7th Cir. 2002).

Thompson has not established an actual conflict of interest as *Mickens* and *Fuller* define that term.  There is no indication that Thompson's trial counsel ever actively represented Mrs. Thompson.  Rather, Thompson's argument is that counsel in effect acted to further her interests, not Thompson's, when counsel asked the Court to admonish Mrs. Thompson regarding the Fifth Amendment and the possibility of a perjury prosecution.  That does not mean he was acting as her lawyer or that he was necessarily even acting contrary to Thompson's interest.  Mrs. Thompson was not, after all, a disinterested bystander; she is Thompson's spouse, and one reasonably might

42

think that he would have a legitimate interest in keeping her out of harm's way if, in fact, she had a possibility of criminal exposure.

The problem with this episode, in the Court's view, was not that Thompson's trial counsel was laboring under an actual conflict of interest; rather, it was that counsel took critical steps that deprived his client of valuable evidence without even realizing that was what he was doing. Had counsel performed a reasonable investigation prior to trial as discussed in the previous section, he would have known what Mrs. Thompson would say if asked about her knowledge of the gun, and it is reasonable to believe that he would not have interposed an objection (indeed, the point of the Court's earlier discussion is that reasonable trial counsel would have presented this testimony himself). In short, counsel's unreasonably inadequate investigation led him to take steps in the course of the trial that materially prejudiced Thompson. That was the problem with counsel's actions – not that he was representing conflicting interests.

The government appears to argue that Thompson's trial counsel made a strategic, or at least a reasonable, choice to interject himself during the cross-examination and prompt the Court to instruct Mrs. Thompson regarding the danger of self-incrimination. The Court rejects this argument. First, the record provides no basis to draw an inference that trial counsel made anything that reasonably could be called a tactical or strategic choice. "Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer." *Davis*, 388 F.3d at 1063-64 (quoting

*Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990)).[8]  Rather, it is clear, both from the record itself and from the Court's observation of trial counsel at the time, that counsel was doing anything but acting strategically; rather, he was quite plainly making it up as he went along.  This is clear from, among other things, the fact that after in effect persuading the Court to instruct Mrs. Thompson on the dangers of her testimony in a way that induced her to decline to answer, counsel then tried to go into the topic himself on redirect examination!

In any event, even were the Court to assume, contrary to the evidence and the Court's firsthand observation of trial counsel, that counsel made a strategic decision to keep Mrs. Thompson from testifying, that would not insulate his actions from scrutiny. Under *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Strickland*, 466 U.S. at 690-91.  Based on the undisputed facts now in the record, trial counsel acted as he did *without any idea what Mrs. Thompson's testimony on the subject would be* – because he had never asked her.  A so-called "strategic" choice made in the blind is no strategy at all; it is no better than throwing darts at a board while blindfolded.  Counsel's actions, given the circumstances, amounted to performance well below an objective standard of reasonableness.

The prejudice to Thompson from counsel's deficient performance is, once again,

---

[8]  As noted earlier,  when asked by the Court at a status hearing on April 23, 2008 whether either side wanted the Court to conduct an evidentiary hearing on Thompson's post-trial motions, the government (as well as Thompson) said no.

patently obvious.  The Court need not rehash the entire discussion of prejudice contained in the previous section of this decision.  A reasonable defense attorney not only would not have objected to Mrs. Thompson's testimony about the gun; he would have introduced that testimony himself, because it undeniably tended to exculpate Thompson.  As the Court has found, it is not just reasonably probable that the admission of her testimony would have made a difference in the outcome; it is likely he would have been acquitted.  Trial counsel's performance in this regard buttresses the Court's earlier conclusion that Thompson suffered a prejudicial violation of his Sixth Amendment right to effective assistance of counsel, entitling him to a new trial.

Finally, the government says that counsel was "actually quite savvy" and suggests that Mrs. Thompson's refusal to testify benefitted the defense because it enabled counsel to suggest that the gun was hers.  *See* Govt. Mem. at 12.  This argument it utterly lacking in merit.  There was nothing "savvy" about counsel's performance; he was, based on the events and the Court's observation of his demeanor, plainly flying by the seat of his pants.  In any event, the Court specifically instructed the jury to disregard and not to consider in any way the prosecutor's question touching on Mrs. Thompson's knowledge regarding the gun, and there is no basis to believe the jury did not follow that instruction.  In addition, Thompson's counsel did not actually argue that the gun was Mrs. Thompson's; though he made reference to her access to the Isuzu, his focus was on the three other people who had accompanied Thompson to the party on the night of January 20.  *See* Feb. 7, 2008 Tr. 217-18.

### iii.    Failure to investigate absence of citations

Thompson's trial counsel presumably learned from his client that, contrary to

officer Walter's trial testimony, he was not given any traffic citations following his arrest. Based on this knowledge, counsel asked Walter on cross examination at trial, though not at the suppression hearing, whether he had given Thompson any traffic citations. Walter testified that he had. When defense counsel confronted Walter with an abstract of Thompson's driving record, which showed no traffic violations, Walter responded that the state court prosecutor had dismissed the citations. Defense counsel then immediately dropped the line of questioning. He obviously had nothing more to offer on the subject. As a result, the point that counsel had begun to develop fizzled; it became a non-issue.

With his motion for new trial, Thompson has provided evidence demonstrating not just that Thompson had no record of any traffic violations, but that no traffic tickets were issued to him in 2006. *See* Delilah Lomax Affid. ¶¶ 2-5. The government does not dispute this; it has offered no evidence suggesting that, as Walter testified, he actually issued tickets, but a prosecutor later dismissed them. In other words, the evidence that Thompson has now obtained reflects that Walter's testimony on this point was erroneous.[9]

Thompson's trial counsel quite obviously had some awareness of the discrepancy between Walter's trial testimony and the actual state of affairs – he did, after all, ask Walter questions bearing directly on that issue – but he evidently lacked the ammunition to give the lie to Walter's explanation. Specifically, there is no indication that Thompson's trial counsel ever took the relatively simple steps described

---

[9] The Court does not intend by this to suggest that the testimony was knowingly false; that is a matter for debate.

by Thompson's affiant, a law school graduate working as a paralegal for Thompson's current counsel, to document the absence of any traffic citations. A reasonable attorney who knew, as Thompson's trial counsel presumably did, that he intended to address this topic with Walter at trial would have taken the simple investigatory steps needed to prove up the anticipated impeachment.

The prejudice to Thompson at trial from counsel's failure to investigate is, however, less clear. The Court is hard-pressed to see, and Thompson does not explain, how proving up that Walter gave false or erroneous testimony at trial would have had a reasonable probability to affect the jury's verdict. At trial, Walter's credibility was of limited significance. Though he did, to be sure, testify that the gun was found in the car, Thompson does not suggest a plausible line of defense that could have been premised on trying to show that testimony was lacking in credibility (e.g., that the gun was planted by the police). The way the case was tried, the dispute was about whether the evidence supported a finding of knowing possession, not whether the gun had been in Thompson's Isuzu before Walter stopped him. In this regard, Walter's testimony regarding where he saw the gun actually was more favorable to Thompson than the testimony of Maclaren. Walter indicated the gun was mostly under the driver's seat – arguably making it less plausible that Thompson knew it was there – whereas Maclaren said it was on the floor behind the seat – where it could have been seen more easily.

On the other hand, a successful attack on Walter's credibility very well could have impacted the outcome of the suppression hearing. Walter's credibility was a significant factor at that hearing. For reasons the Court will discuss later in this decision, the Court now believes that its conclusion on the inevitable discovery issue

was incorrect based on the evidence presented.  The inevitable discovery conclusion was, however, what permitted the Court not to make a credibility finding regarding the testimony of Walter and others.  Thus without the inevitable discovery ruling, a credibility finding would have been required in order to resolve the motion to suppress. There is a reasonable probability that further impeachment of Walter would have changed the outcome on the motion to suppress.

### iv.    Failure to cross examine Walter regarding false statement

Thompson also attacks trial counsel's failure to cross examine Walter regarding the finding that he made a false statement in an internal police investigation.  The Court is unpersuaded that this omission impacted the outcome of the trial.  This is so for the reasons stated in the previous section and, perhaps, for the additional reason that it appears, based on the government's representations to the Court, that Walter would have testified that the finding was later overturned.  And for the latter reason, the Court cannot, based on the present record, conclude that impeachment of Walter on this basis at the suppression hearing is reasonably probable to have impacted the Court's ruling on the motion to suppress.

The Court notes, however, that there is no plausible strategic explanation for counsel's failure to introduce this evidence at the suppression hearing.  Counsel clearly knew of the false statement then; he discussed it with the Court shortly after the hearing.  At the hearing before the Court (as opposed to the trial), there was nothing to be gained by omitting this impeachment.  Based on the fact that counsel quite plainly suffered a bout of forgetfulness regarding this subject during the trial (which in turn may well have been impacted by lack of appropriate preparation), the Court can only

conclude that the omission at the suppression hearing occurred for the same reason.

### f. Ruling on motion to suppress evidence

Thompson argues that the Court should have granted his motion to suppress because the government did not prove that his arrest was lawful, a predicate to a proper search incident to arrest, did not prove that a search incident to arrest inevitably would have occurred, and did not prove that there was probable cause to search the car.

The government argues that it established that there was probable cause to arrest Thompson; it was permissible to search his car incident to his arrest; and a search of a car incident to arrest may occur shortly before a formal arrest occurs. The government also argues, in a footnote, that the evidence established probable cause to search the Isuzu for evidence of a crime, specifically, the crime of driving under the influence.

### i. Inevitable discovery

The Court upheld the search of Thompson's Isuzu under the inevitable discovery doctrine, ruling that even if the car was searched without probable cause prior to Thompson's arrest, the government had shown that it would have been searched a matter of minutes later. Thompson argues that the Court erred in making that ruling.

Under the inevitable discovery doctrine, evidence improperly seized is admissible if the government "prove[s] by a preponderance that authorities '*would* have found the challenged evidence through lawful means.'" *United States v. Cherry*, 436 F.3d 769, 772 (7th Cir. 2006) (quoting *United States v. Jones*, 72 F.3d 1324, 1334 (7th Cir. 1995) (emphasis added in *Cherry*)).

Though the Court articulated the burden of proof correctly in its oral ruling, it did not explain how the government had met the burden, other than by stating in conclusory fashion that "the government established that a search incident to arrest was an inevitable result of this type of arrest." Feb. 4, 2008 Tr. 104; *see also id.* 105 ("I think there is enough evidence here for the government to have established that a search incident to arrest would have happened maybe two minutes later than it did happen, but that it would have happened."). The Court has reconsidered the matter in light of Thompson's post-trial motion and now concludes that it erred. In fact, the government offered no evidence that a search of Thompson's Isuzu inevitably or even likely would have followed his arrest while inside the 7-Eleven store.

Upon reflection, the Court's reasoning, though not expressed in its oral ruling, was essentially circular: the Court relied on the fact that Maclaren *actually* searched the car to conclude that he *inevitably* would have searched the car following Thompson's arrest. Maclaren's testimony was that he in fact searched the car post-arrest, not that such was his usual practice. In any event, reliance on Maclaren's testimony to support a finding that a post-arrest search would have happened anyway required a determination that his testimony about when the search occurred was credible – a finding the Court did not make and that the government asked the Court not to make.[10] The Court thus inadvertently skipped a step in the course of determining that a post-arrest search incident to arrest was inevitable. In short, the Court failed to

---

[10] To put it another way, had the Court concluded that Thompson was credible and thus that the search occurred prior to his arrest, the fact of a pre-arrest search would not begin to suggest the likelihood or inevitability of a post-arrest search.

hold the government to its burden of proof and thus erred in its inevitable discovery ruling.

### ii.     Probable cause to search vehicle

The government argues that irrespective of the inevitable discovery doctrine, the search of the vehicle was authorized due to the existence of probable cause to believe it contained evidence of a crime.  In its oral ruling, the Court stated that it was likely that the search was justified for this reason but declined to deny the motion on this basis because it believed other grounds – the claimed inevitability of the search as a search incident to arrest – justified the search.  Having reconsidered the matter in light of the post-trial briefing, the Court now determines that its tentative belief the search likely was justified by probable cause was incorrect.

As the Seventh Circuit stated in *United States v. McGuire*, 957 F.2d 310 (7th Cir. 1992), the "automobile exception" to the Fourth Amendment's warrant requirement allows the search of an automobile if there is probable cause to believe that it contains contraband or evidence of a crime.  *Id.* at 314 (citing *Carroll v. United States*, 267 U.S. 132, 149, 153-56 (1925)).  Probable cause exists if, given the totality of the circumstances, there is a "fair probability" that the car contains contraband or evidence of a crime.  *Id.* (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

In its ruling following the hearing, the Court did not make a definitive determination regarding exactly when the search occurred, believing this unnecessary due to the justifiability of the search on inevitable discovery grounds.  In addition, though the Court did not express this at the time, it was reluctant to rely on the probable cause argument because the government offered no authority supporting the

proposition that the existence of probable cause to arrest Thompson for driving under the influence,[11] or the other facts Walter cited, provided probable cause to believe that the Isuzu contained evidence of that or any other crime.

In *McGuire*, the Seventh Circuit ruled that probable cause to search the defendant's car existed because the officer had observed an open container of alcohol in the car. In addition, in its initial brief opposing Thompson's motion to suppress evidence, the government cited *United States v. Wimbush*, 337 F.3d 947 (7th Cir. 2001), a case in which the court found probable cause to search an automobile based on the officer's observation of an open container of alcohol in the automobile and the fact that he smelled marijuana emanating from the automobile. *Id.* at 950-51. But these cases have limited applicability here. First, unlike in *McGuire*, officer Walter observed nothing inside the car suggesting that alcohol or any other evidence of DUI might be there. Second, when, as in *Wimbush*, an officer perceives the scent of marijuana from inside a car, that indicates marijuana is or recently was in the car. By contrast, when, as in this case, an officer smells alcohol on a person's breath, that typically indicates the person was drinking an alcoholic beverage, not that the car currently contains alcohol or an open container (Walter clearly stated that he smelled alcohol on Thompson's breath, not that the smell of alcohol emanated from elsewhere inside the vehicle). Finally, though the government argued that the evidence of Thompson's erratic driving and his behavior provided probable cause to believe that

---

[11] In his motion for new trial, Thompson argues that probable cause to arrest was lacking. This point, however, was not raised at the hearing on the motion to suppress, and thus it does not provide a proper basis upon which to revisit the Court's ruling on the motion.

there was alcohol in the car, it cited no case so holding.[12]

There is, at least potentially, another problem with reliance on the theory that there was probable cause to believe that the Isuzu contained evidence of the offense of driving under the influence. Walter, the only officer on the scene who had any idea why Thompson had been stopped, did not search the car or direct any other officer to do so. Rather, the evidence showed that Maclaren and Fraterrigo searched the car on their own, without any prompting. There was no evidence that, at the time of the search, Maclaren or Fraterrigo had any idea why Thompson had been pulled over or any awareness that he was believed to have been driving while under the influence. The evidence adduced at the suppression hearing regarding how and why Maclaren was summoned to the scene was simply that Walter asked him to come there, without any indication why. Although Maclaren testified that he observed Walter conducting one of the field sobriety tests inside the 7-Eleven store, there is no indication that he observed Thompson fail the test or otherwise had any awareness of why Walter was performing the test.[13]

If Walter had directed Maclaren to search the car or had himself participated in the search, then Walter's knowledge of the evidence of Thompson's apparent intoxication could be imputed to Maclaren to attempt to justify the search. *See, e.g.,*

---

[12] The Court also notes that the government's footnote reference to the probable-cause-to-search argument in its response to Thompson's motion for new trial includes no citation to authority.

[13] Maclaren reasonably might have assumed that Walter had stopped Thompson for some sort of traffic offense, but a stop of a person for a routine traffic offense does not justify a full search of the person's vehicle. *See Knowles v. Iowa*, 525 U.S. 113, 114 (1998). The fact that Walter had Thompson out of the car would not have told a reasonable officer in Maclaren's position much of anything; an officer is entitled to order a driver out of a car even for a routine traffic stop. *See Maryland v. Wilson*, 519 U.S. 408, 415 (1997).

*United States v. Ledford*, 218 F.3d 684, 689 (7th Cir. 2000). But Maclaren searched

the car with Fraterrigo, not with Walter, and he did not indicate that Walter asked or told

him to conduct a search.

Nor can the government rely on the so-called "collective knowledge" doctrine,

under which the knowledge of officers who communicate with each other is attributed to

all of them. This doctrine applies only when the officers are in communication. *See,*

*e.g., United States v. Ellis*, 499 F.3d 686, 690 (7th Cir. 2007); *Reynolds v. Jamison*, 488

F.3d 756, 768 n.7 (7th Cir. 2007); *United States v. Parra*, 402 F.3d 752, 766 (7th Cir.

2005). The government offered no evidence that there was any such contact between

Walter and Maclaren – rather, it showed only that Maclaren was summoned to the

scene at Walter's request, with no indication that Walter said what he was doing or why

Maclaren was needed.

For these reasons, the Court now concludes that the government's probable-

cause-to-search theory does not provide a viable basis to justify the search of

Thompson's Isuzu.

### iii.    Search incident to arrest

A potentially stronger basis to justify the search lies in the government's search-

incident-to-arrest argument. As the Seventh Circuit has stated,

> [g]enerally, it is legal to search a vehicle incident to a lawful custodial
> arrest, including the contents of any closed containers found inside, in
> order to disarm the suspect or preserve evidence of a crime. *See New*
> *York v. Belton*, 453 U.S. 454, 460 (1981). It is not, however, permissible
> to conduct a *Belton* search pursuant to a traffic citation alone. *Knowles v.*
> *Iowa*, 525 U.S. 113 (1998). In *Knowles*, the Court underscored that a
> *Belton* search may not be conducted as part of a mere traffic stop, even if
> there is probable cause for the traffic stop, or probable cause to arrest the
> driver for the traffic violation. In order to conduct a *Belton* search, the

occupant of the vehicle must actually be held under custodial arrest. *Id.* at 118.

*Ochana v. Flores*, 347 F.3d 266, 270 (7th Cir. 2003).

Were the Court to credit the testimony of Walter and Maclaren at the suppression hearing, it would have to conclude that the search did not take place until after Thompson's arrest and that it was, as a result, justified as a search incident to that arrest. At the hearing, however, the government asked the Court *not* to make a determination regarding the relative credibility of Walter and Maclaren on the one hand and Thompson on the other. Feb. 4, 2008 Tr. at 77, 96-97. The Court is unwilling, post-trial, to re-approve the search based on an implicit credibility determination that the government asked the Court not to make – especially in light of Thompson's claim that his prior attorney failed to offer evidence bearing on Walter's credibility, as well as the Court's reference, in its oral ruling, to "problematic" aspects of the testimony of Maclaren and Walter.

The government argues, however, that no credibility determination is required, for even if Thompson's version is credited the search still can be justified as incident to his arrest. Though Thompson testified that the search took place before his arrest, the government argues that this does not prevent the search from being considered to have been incident to his arrest. The government's reasoning goes as follows: (1) under *Belton* and *Thornton v. United States*, 541 U.S. 615 (2004), the search-incident-to-arrest doctrine permits the search of a car occupied by the arrestee (*Belton*), even if he has left the vehicle prior to his arrest (*Thornton*); (2) under *Rawlings v. Kentucky*, 448 U.S. 98 (1971), a search incident to arrest is not rendered improper because it takes

place immediately before the arrest; and (3) *Rawlings* applies equally to a search of a car incident to the occupant's arrest, thus rendering legal Maclaren's search of Thompson's Isuzu even if it took place a minute or two before Walter had arrested Thompson inside the 7-Eleven store.

The primary problem with the government's argument is that the Seventh Circuit has not extended *Rawlings* to *Belton* searches of automobiles. In *Ochana*, the court stated that

> [g]enerally, it is legal to search a vehicle incident to a lawful custodial arrest, including the contents of any closed containers found inside, in order to disarm the suspect or preserve evidence of a crime. *See New York v. Belton*, 453 U.S. 454, 460 (1981). It is not, however, permissible to conduct a *Belton* search pursuant to a traffic citation alone. *Knowles v. Iowa*, 525 U.S. 113 (1998). In *Knowles*, the Court underscored that a *Belton* search may not be conducted as part of a mere traffic stop, even if there is probable cause for the traffic stop, or probable cause to arrest the driver for the traffic violation. *In order to conduct a Belton search, the occupant of the vehicle must actually be held under custodial arrest. Id.* at 118.

*Ochana*, 347 F.3d at 270 (emphasis added).

The Court need not address the point further in light of the Seventh Circuit's clear statement that a *Belton* search of an automobile requires a prior custodial arrest of the occupant. There is, however, another good reason why *Rawlings* is not appropriately extended to *Belton* searches, at least in the present context. To illustrate this, a summary of the facts in *Rawlings* is necessary. In that case, the police went to the house of a man named Marquess with a warrant for his arrest. The police found five people in the home, including Rawlings, but Marquess was not there. While searching for Marquess, the police smelled marijuana smoke and saw marijuana seeds on top of a dresser. Two officers left to obtain a search warrant while other officers

detained the house's occupants in the living room.  The two officers returned with a search warrant about forty-five minutes later.  They read the warrant and *Miranda* warnings to Rawlings and a woman, who were seated on a couch with the woman's purse between them.  An officer directed the woman to empty her purse; she did so, putting its contents, including illegal narcotics, onto a table.  The woman then turned to Rawlings and told him to take what was his.  Rawlings said the narcotics belonged to him.  An officer then searched Rawlings' person, finding currency and a knife.  Rawlings was then arrested and was later indicted for possession of narcotics.

The Supreme Court addressed, among other issues, the legality of the seizure of the knife and currency from Rawlings' person.  The Court upheld the search as "incident to petitioner's formal arrest."  It stated that once Rawlings admitted ownership of the narcotics in the woman's purse, "the police clearly had probable cause to place [him] under arrest.  Where the formal arrest followed quickly on the heels of the challenged search of [Rawlings'] person, we do not believe it particularly important that the search preceded the arrest rather than vice versa."  *Rawlings*, 448 U.S. at 911.

The contrast between this case and *Rawlings* is readily apparent:  if one credits Thompson's testimony regarding the sequence of events, at the point in time when Maclaren searched the car, he had no basis to believe there was probable cause to arrest Thompson.  Maclaren's search, if Thompson is correct regarding the sequence of events, amounted to a search justifiable only due to a prior traffic stop (the only fact it appears Maclaren knew), a justification that the Supreme Court specifically rejected in *Knowles*.  Were the Court to uphold Maclaren's search of the Isuzu without regard to the relative credibility of Thompson and the officers, it would be saying, in effect, that

Maclaren was allowed to search the car despite having no information other than the fact that Walter had pulled Thompson over for some reason, simply because Thompson was arrested a minute or two later. Allowing such a justification to carry the day would render *Knowles* a nullity.

### iv. Summary regarding motion to suppress

Because the Court has concluded it erred in finding that the government met its burden of proof on the claim of inevitable discovery, the Court must vacate its ruling denying Thompson's motion to suppress. The government's strongest alternative basis to uphold the search of Thompson's Isuzu lies in its claim that the search was justified under *New York v. Belton* and its progeny as a search incident to Thompson's arrest. As the Court has stated, assessment of that claim requires findings on the relative credibility of Walter, Maclaren, and Thompson. The Court could attempt to make such findings based on the record as it now exists. But given Thompson's contention that his previous lawyer failed to introduce significant evidence bearing on Walter's credibility, the Court believes that the most appropriate course is to reopen the hearing on the motion to suppress. In fairness to both sides, the Court will permit both Thompson and the government to introduce additional evidence at the reopened hearing – whether it concerns the search-incident-to-arrest theory or any of the other theories on which the government sought to justify the search. Prior to the reopened hearing, the Court will require the government to identify the theory or theories on which it intends to introduce evidence, so that Thompson's counsel can prepare to meet any additional evidence the government seeks to offer.

**Conclusion**

For the reasons stated above, the Court denies Thompson's motion for a judgment of acquittal and his motion to arrest judgment [docket nos. 105-1 & 105-2]; grants his motion for a new trial [docket no. 105-3]; vacates its ruling denying Thompson's motion to suppress evidence; and reopens the hearing on the motion to suppress. The case is set for a status hearing on May 22, 2008 at 1:30 p.m. for the purpose of setting a date for completing the hearing on the motion to suppress and for retrial of the case. Thompson's motion for leave to file oversized brief [docket no. 104] was previously granted and is therefore terminated.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  May 20, 2008